# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: October 29, 2019

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| INDIGO GRANT, | * | |
| *Parent and natural guardian of* | * | UNPUBLISHED |
| M.G., *a minor,* | * | |
| | * | No. 17-1816V |
| Petitioner, | * | |
| v. | * | Special Master Gowen |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' Fees and Costs; Reasonable |
| AND HEALTH SERVICES, | * | Basis; Interim Award; Motion to Withdraw; |
| | * | Intra-Office Communications; Duplicative |
| Respondent. | * | Work. |
| * * * * * * * * * * * * * | | |

<u>Renee J. Gentry</u>, Vaccine Injury Clinic, George Washington University Law School, Washington, DC, for petitioner.
<u>Adriana R. Teitel</u>, United States Department of Justice, Washington, DC, for respondent.

## DECISION ON INTERIM ATTORNEYS' FEES AND COSTS[1]

On November 20, 2017, Indigo Grant, as parent and natural guardian of M.G., a minor ("petitioner"), filed a petition for compensation in the National Vaccine Injury Compensation Program. Petitioner's claim relates to M.G.'s receipt of diptheria-tetanus-acellular pertussis ("DTaP"), Haemophilus influenzae type B ("Hib"), and inactivated polio virus ("IPV") vaccines on December 30, 2014, as well as DTaP, Hib, IPV, and Pneumococcal vaccines on February 26, 2015. Petitioner alleges that as a result of these vaccines, M.G. suffered sepsis, severe dermal reactions, and eventually death on January 13, 2016. Petitioner's counsel now requests an award of interim attorneys' fees and costs upon seeking to withdraw from the claim. **I hereby GRANT petitioner's motion and award $21,604.90 in interim attorneys' fees and costs.**

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), **because this opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). An objecting party must provide the court with a proposed redacted version of the opinion. *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

## I.    Summary of Relevant Facts

M.G. was born on October 25, 2014.  Her family resided in Duchess County, New York.
They established primary care with a pediatrician in that region.  On November 8, 2014, she had
a normal two-week exam.  Ex. 2 at 33-34.  On November 25, 2014, she had a normal one-month
exam and received her second Hepatitis B vaccine.  *Id.* at 2, 30-32.  On December 30, 2014,
M.G. had her two-month well-baby vaccination.  She received DTaP, Hib, and IPV vaccinations
in her left thigh.  *Id.* at 2, 27-29.

Fourteen days after vaccination, on January 13, 2015, M.G.'s right cheek appeared pink,
dry, and scaly.  Ex. 3 at 1-2 (date-stamped photographs).

Thirty-eight days after vaccination, on February 7, 2015, M.G. was admitted to Inova
Fairfax Hospital in Fairfax, Virginia.  The medical records provide that the family was visiting
from New York "for a couple weeks."  Ex. 5 at 5.  M.G.'s brother, who was 14 months old, had a
history of "recurrent highly resistant MRSA[2] infections since the age of 1 month old, requiring 4
hospializations over the last year."  *Id.*  He was recently discharged from Virginia
Commonwealth University ("VCU") Medical Center with diagnoses of Wiskott-Aldrich
syndrome[3] and hyper-IgE syndrome.[4]  *Id.*  Petitioner was concerned that M.G. had developed a
similar rash.  *Id.*  The emergency room attending physician recorded petitioner's report that M.G.
was "well until about 24 hours prior to presentation.  Since then, [petitioner] noted skin changes
on left leg, both arms, and scalp.  Extremity wounds expanded, then the left leg and right arm
opened and started to drain this evening.  Patient has a history of cradle's cap,[5] but the flakiness
had worsened and changed color from white to yellow."  *Id.* at 7.  The admitting pediatrician
recorded that petitioner "first noted dry skin 1 month ago (after using a particular detergent,
however it persisted) but did not take pt to doctor as they'd moved and were in between PCPs.
[Petitioner] has tried all kinds of emollients w/ little change."  *Id.* at 24.  M.G.'s bloodwork was
normal except for an *elevated* platelet count of 684 and *elevated* eosinophils at 1.24 (the
reference ranges are not provided).  *Id.* at 27.  A wound culture and gram stain were positive for

---

[2] MRSA is *Staphylococcus aureus* bacteria which is resistant to methicillin (a synthetic form of penicillin).
*Dorland's Illustrated Medical Dictionary* 32nd Ed. (2012) (hereinafter "*Dorland's*") at 1147, 1184, 1765.

[3] Wiskott-Aldrich syndrome is "an X-linked immunodeficiency syndrome characterized by eczema,
thrombocytopenia, and recurrent pyogenic infection.  Patients cannot produce antibodies to polysaccharide antigens
and have increased susceptibility to infection with encapsulated bacteria (*Haemophilus influenzae*, meningococcus,
pneumococcus).  Typically IgM is low, IgA and IgE are elevated, and there is anergy of the skin.  Many affected
persons also have lymphoreticular disorders."  *Dorland's* at 1854.

[4] Hyper-IgE syndrome is "a primary immunodeficiency disorder caused by mutations of the STAT3 gene.  It is
usually of autosomal dominant inheritance but sometimes occurs sporadically and is characterized by recurrent
staphylococcal abscesses of skin, lungs, joints, and other sites; pruritic dermatitis; distinctive course facies; retained
primary dentition; pruritic dermatitis; distinctive coarse facies; retained primary dentition; skeletal abnormalities;
eosinophilia; and very high serum immunoglobulin E (IgE) levels."  *Dorland's* at 1834.

[5] Cradle cap is *crusta lactea*, a seborrhea (either excessive secretion of sebum, or dermatitis) of the scalp of nursing
infants.  *Dorland's* at 282, 437, 1684.

staphylococcus and serratia odorifera.  *Id.* at 49-50.  Vancomycin[6] was started then discontinued "as re-exam did not demonstrate any signs of infection."  *Id.* at 40.  On February 8, 2015, M.G. was discharged from the hospital with an assessment of "diffuse severe eczema without evidence of bacterial superinfection."  IgE and multiple culture studies were pending.  M.G. was to follow up with a pediatric allergist-immunologist and a pediatric dermatologist.  *Id.* at 40-45.

On February 23, 2015, M.G. was readmitted to Inova Fairfax Hospital for worsened eczema, diarrhea, and fever.  Ex. 5 at 115.  During this hospitalization, M.G. received skin care and antibiotics.  *Id.* at 115-17.  On consultation, pediatric dermatologist Dr. Robert Silverman assessed: "The family history, past history of infections, and current diarrhea may be indicative of an immunodeficiency as a cause of this child's dermatitis."  Dr. Silverman suggested further "immune workup."  *Id.* at 132.  By February 25, 2015, M.G.'s skin was "improved" and she remained "afebrile and well-appearing."  The discharge plan was to follow up with her primary care provider as well as the pediatric allergist-immunologist and a pediatric dermatologist mentioned above.  Petitioner objected to M.G.'s discharge and requested a second opinion.  She was concerned that M.G. had an undiagnosed bacterial infection.  Several physicians at the hospital were of the opinion that M.G.'s "exam and workup [we]re not consistent with a bacterial infection."  M.G. was referred to an immunologist at Children's National Medical Center ("CNMC") in Washington, DC.  *Id.* at 151-52.

On February 26, 2015, M.G followed up with her pediatrician in New York.  His records provide that M.G. was "hospitalized at Fairfax in Virginia for staph/serrata in blood."  At the pediatrician's office, M.G. received DTaP, IPV, Hib, Pneumococcal vaccines.  Ex. 2 at 2, 24-26; *see also* Ex. 6 at 37, 42 (CNMC medical records dated March 1, 2015, noting that M.G. had received "2 and 4 mo vaccines").

On February 28, 2015, M.G. presented with a worsening staph infection and intermittent fever to the emergency room at Children's National Medical Center.  Ex. 6 at 22; *see also* Ex. 4 at 3-13 (photos).  She was admitted with "concern for atopic dermatitis with possible superinfection."  She was discharged with an assessment of atopic dermatitis on March 3, 2015.  Ex. 6 at 58-59.

On April 30, 2015, M.G. presented as an outpatient to the CNMC Immunology Clinic, where she saw Dr. Brett Loechelt and Dr. Rachel Sparks, who noted the family history of Wiskott-Aldrich syndrome, hyper-IgE syndrome, and hypereosinophilic syndrome.[7]  M.G.'s bloodwork showed elevated white blood cells, lymphocytes, and eosinophils.  She had low IgG, normal IgA and IgM, and elevated IgE.  Ex. 6 at 18.  The differential included severe atopy,[8]

---

[6] Vancomycin is an antibiotic treatment for bacterial infections including staphylococci.  *Dorland's* at 2023.

[7] Hypereosinophilic syndrome is "any of several diseases characterized by a massive increase in the number of eosinophils in the blood and bone marrow, with eosinophilc infiltration of other organs.  Symptoms vary, depending on the organ involved, any may include pruritic skin ulcers…" *Dorland's* at 1833.

[8] Atopy is "a genetic predisposition toward the development of immediate (type I) hypersensitivity reactions against common environmental antigens (atopic allergy).  The most common clinical manifestation is allergic rhinits; bronchial asthma, atopic dermatitis, and food allergy occur less frequently."  *Dorland's* at 173.

congenital ichthyosis,[9] and Netherton syndrome.[10]  Dr. Loechelt and Dr. Sparks recommended that M.G. return to Dr. Silverman, the dermatologist she had seen as an inpatient at Inova Fairfax Hospital, for further evaluation and possibly a skin biopsy.  M.G. would also follow up with the immunology clinic.  Ex. 6 at 18.

Six weeks later, on June 10, 2015, Dr. Loechelt saw M.G. for a follow up.  Repeat labwork revealed normalized white blood cells and lymphocytes, but eosinophils remained elevated.  IgG remained low.  IgA and IgM remained normal.  For some reason, "IgE was not obtained again."  Dr. Loechelt's impression was that M.G.'s history was "either consistent with severe atopic dermatitis or hyper IgE syndrome."  He ordered testing of "specific antibodies to diphtheria and tetanus… CBC, protein and albumin, CH50, immunoglobulins, and hemoglobin electrophoresis... stool cultures… [and] STAT3[11] test."  He wanted "to be in communication with [M.G.'s] dermatologist, Dr. Silverman, regarding her skin care regimen."  Dr. Loechelt also wanted M.G. to "follow up in [the CNMC Immunology Clinic] in 2 to 3 months or sooner as needed."  Ex. 6 at 5-8.

There are no additional medical records from June 10, 2015 to January 13, 2016.  Petitioner averred that she "was advised to follow up with her immunologist once M.G. was able to walk" and "there were no other medical appointments during this time because petitioner had stopped vaccinating M.G. at the instruction of one of her doctors at Children's National Medical Center."  (But upon review, the CNMC medical records do not provide that M.G. should stop receiving vaccinations.)  Petitioner also averred that after M.G.'s hospitalization at Inova Fairfax Hospital, she never had an outpatient appointment with the dermatologist Dr. Silverman because he "did not have any appointments available for several months" and she was instead told to see an immunologist.  Pet. Supplemental Statement of Completion filed June 29, 2018 (ECF No. 19).

On January 13, 2016, at fourteen months of age, M.G. was discovered unresponsive and pulseless after having been placed down for a nap.  Ex. 7 at 3.  She was brought to Mary Washington Hospital in Virginia, where she was intubated and received CPR.  She was soon transferred to VCU Medical Center.  Certain records contain petitioner's report that M.G. had a history of immunodeficiency and vaccine reaction(s), that the family was pursuing legal action for the same, and that M.G. had not received any vaccines since early 2015.  Ex. 3 at 43, 86-87.  At VCU, M.G. remained intubated and medically supported.  She did not make any spontaneous

---

[9] Ichthyosis is "any in a group of cutaneous disorders characterized by increased or aberrant keratinization, resulting in inflammatory scaling of the skin."  A congenital form is simply "present at birth" rather than acquired later on in life.  *Dorland's* at 910-11.

[10] Netherton syndrome is a rare genetic syndrome.  *Dorland's* at 1840-41.  Newborns with this condition have skin that is red, scaly, and may leak fluid.  After infancy, the severity of the skin abnormalities varies and can fluctuate over time.  Most patients have immune system-related problems such as food allergies, hay fever, asthma, or an inflammatory skin disorder called eczema.  National Institutes of Health Genetics Home Reference, *Netherton syndrome*, at https://ghr.nlm.nih.gov/condition/netherton-syndrome (last accessed October 23, 2019).

[11] STAT3 is an abbreviation for "signal transducer and activator of transcription 3."  National Institutes of Health Genetics Home Reference, *STAT3 Gene*, at https://ghr.nlm.nih.gov/gene/STAT3 (last accessed October 23, 2019).  As noted in a footnote above, mutations in the STAT3 gene are believed to cause the primary immunodeficiency disorder termed hyper-IgE syndrome.  *Dorland's* at 1834.

movement or respirations. She had suffered a severe hypoxic injury. Ex. 3 at 85. Following the utilization of a brain death protocol, she was pronounced dead on January 15, 2016. *Id.* At the hospital, the preliminary cause of death was ruled to be an anoxic brain injury. Ex. 3 at 121-22; *see also* Ex. 9 (death certificate providing that the cause was "pending"). Following an autopsy, the cause of death was listed as "sepsis due to pneumonia." Ex. 10 at 3.

## II.   Procedural History

Petitioner was initially in contact with another attorney with experience in the Vaccine Program, Mr. Bruce W. Slane.[12] He obtained some of the medical records, then referred her case to the current attorney of record, Ms. Gentry. Ex. 2 at 1; Ex. 3 at 1; Ex. 6 at 1; Petitioner's Application for Interim Attorneys' Fees and Costs filed May 20, 2019 (ECF No. 30) ("Int. Fee App") at 2.

Mr. Shoemaker, supervising student-attorneys at the Vaccine Injury Clinic at George Washington University Law School ("GW Vaccine Clinic"), prepared the petition which was filed on November 20, 2017. Petition (ECF No. 1); *see also* Amended Petition (ECF No. 14) (correcting the exhibit numbers cited). On December 15, 2017, I directed petitioner to file all records in support of her claim and a Statement of Completion by January 16, 2018. Scheduling Order (Non-PDF). After receiving three extensions of time, petitioner filed a Statement of Completion on March 6, 2018 (ECF No. 12).

Following petitioner's filing of the Statement of Completion, I suspended the deadline for respondent to file a formal report pursuant to Vaccine Rule 4(c) (which requires respondent to file a report "setting forth a full and complete statement of [respondent's] position as to why an award should or should not be granted"). However, I required respondent to file a status report indicating whether respondent believed there were any outstanding records and whether respondent wanted to explore informal resolution or proceed on a litigation track. Initial Order filed March 7, 2018 (ECF No. 13). Respondent filed a status report requesting that petitioner file additional records that appeared to be outstanding. Resp. Status Report filed April 25, 2018 (ECF No. 15). Based on a preliminary review, respondent did not believe that the case was appropriate for settlement negotiations at that time. *Id.*

I ordered petitioner to file the outstanding records and a supplemental statement of completion within 30 days, by May 29, 2018, and an expert report within 60 days thereafter. Scheduling Order filed April 26, 2018 (ECF No. 16). Petitioner received one extension of time. On June 28, 2018, petitioner filed additional medical records from Inova Fairfax Hospital. Petitioner then filed a supplemental statement of completion providing that there were no

---

[12] On November 2, 2016, petitioner, represented by Mr. Slane, filed a petition alleging injuries on behalf of her son, whose initials are also M.G. "After the filing of medical records, Respondent's Rule 4(c) report, and a round of initial expert reports from both sides, petitioner reported that [Mr. Slane] would be withdrawing." Mr. Slane was awarded interim attorneys' fees and costs. *Grant v. Sec'y of Health & Human Servs.*, No. 16-1446V, 2018 WL 58232137 (Fed. Cl. Spec. Mstr. Sept. 18, 2018). He subsequently withdrew from the case. The special master repeatedly directed petitioner to file a supplemental expert report. She failed to do so. Her case was ultimately dismissed for failure to prosecute and for insufficient proof. *Grant*, No. 16-1446V, 2019 WL 1061514 (Fed. Cl. Spec. Mstr. Jan. 18, 2019).

additional records.  Pet. Supp. Statement of Completion filed June 29, 2018 (ECF No. 19).

I directed petitioner to file an expert report within 60 days, by August 28, 2018.
Scheduling Order filed August 2, 2018 (Non-PDF).  On petitioner's motions, her deadline was
extended to October 29, 2018; November 29, 2018; January 28, 2019; and April 5, 2019.  In
granting the fourth motion, I noted that "no further extensions are anticipated."  Order filed
February 4, 2019 (ECF No. 26).

Petitioner's counsel then filed a motion to withdraw.  Mot. to Withdraw filed April 5,
2019 (ECF No. 27).  During a status conference on May 14, 2019, it was confirmed that
petitioner and her counsel had reached an impasse with respect to the objectives and course of
litigation pending before the Court.  Her counsel had been unable to secure an expert report in
support of vaccine causation.  Petitioner wished to continue and was seeking a treating physician
or an expert's opinion in support of vaccine causation.  I directed petitioner to do so and directed
her counsel to file an application for interim attorneys' fees and costs.  I also ordered a status
conference with both counsel and the petitioner herself to take place in July 2019.  Scheduling
Order filed May 14, 2019 (ECF No. 29).

On May 20, 2019, counsel filed the application for interim attorneys' fees and costs,
which requests $19,561.00 in attorneys' fees and $4,000.00 in attorneys' costs, for a total request
of $23,561.00.  Int. Fee App. (ECF No. 30) at 1.  While the application did not include a General
Order No. 9 statement signed by both petitioner and counsel, counsel averred that petitioner "has
no expenses in this matter."  *Id.*

Respondent filed a response, "respectfully request[ing] that the Special Master deny, or in
the alternative defer a ruling on, petitioner's application."  Resp. Response filed June 28, 2019
(ECF No. 32) at 1.  Respondent objected: "First, petitioner has not established that there is a
reasonable basis for this claim.  Second, even if a reasonable basis exists, awarding interim fees
and costs is not warranted at this juncture in this case."  *Id.* at 5.  Petitioner then filed a reply.
Pet. Reply filed July 2, 2019 (ECF No. 35).

On July 10, 2019, I held a telephonic status conference with petitioner Indigo Grant, her
current counsel, and respondent's counsel.  I stated that petitioner had the burden of supporting
her claim via an expert report.  Despite significant time and assistance from experienced counsel,
she had not filed an expert report to date.  Petitioner asserted that she was working to obtain
additional medical records, timestamped photographs, toxicology testing, genetic testing, and an
expert report.  Her counsel agreed to remain in the case and file those materials electronically for
her.  Accordingly, I deferred ruling on counsel's application for interim attorneys' fees and costs
and counsel's motion to withdraw.  Petitioner was ordered to file the additional materials and a
supplemental statement of completion within 60 days, by September 13, 2019.  Scheduling Order
filed July 15, 2019 (ECF No. 38).

On September 14, 2019, petitioner's counsel filed a motion for extension of time.
Counsel represented that they had sent petitioner the scheduling order from the last status
conference (above) and several reminders.  On behalf of petitioner, counsel requested an
extension of 30 days to comply with the scheduling order.  Pet. Motion filed September 14, 2019

(ECF No. 39).  I granted the motion, extending petitioner's deadline to October 17, 2019.
Scheduling Order filed September 14, 2019 (ECF No. 40).

On October 17, 2019, petitioner's counsel filed a status report.  Counsel advised that
despite repeated efforts, they had been unsuccessful in making any contact with petitioner over
the past several months.  As such, counsel respectfully requested that the Motion to Withdraw be
granted.  Pet. Status Report filed October 17, 2019 (ECF No. 41).  Accordingly, the interim fee
application is ripe for consideration.

## III.    Entitlement to Attorneys' Fees and Costs

### A.  Legal Standard

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs."  §
15(e)(1).  If a petitioner succeeds on the merits of his or her claim, the special master shall award
reasonable attorneys' fees and costs.

However, a petitioner need not prevail on entitlement to receive a fee award as long as
"the special master or court determines that the petition was brought in good faith and there was
a reasonable basis for the claim."  § 15(e)(1).  The Federal Circuit reasoned that in formulating
this standard, Congress intended "to ensure that vaccine injury claimants have readily available a
competent bar to prosecute their claims."  *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d
1358, 1362 (Fed. Cir. 2012).

"Good faith" and "reasonable basis" are two distinct requirements.  *Simmons v Sec'y of
Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (citing *Chuisano v. Sec'y of Health
& Human Servs.*, 116 Fed. Cl. 276, 289 (2014)).  Good faith is a subjective inquiry.  *Id.*

In contrast to good faith, "reasonable basis" is an objective consideration which "looks
not at the likelihood of success" but rather to the "feasibility of the claim."  *Chuisano*, 116 Fed.
Cl. at 286.  In evaluating reasonable basis, the special master may not consider the statutory
limitations deadline or related conduct by counsel.  *Simmons*, 875 F.3d 632 at 636.  However, the
special master may consider many other objective factors including the "the factual basis of the
claim, the novelty of the vaccine, and the novelty of the theory of causation."  *Amankwaa v.
Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018).  The reasonable basis inquiry is
"broad enough to encompass any material submitted in support of the claim at *any* time in the
proceeding, whether with the petition or later."  *Chuisano*, 116 Fed. Cl. at 287 (emphasis added).

Indeed, a petitioner is not required to file a petition with medical records or an expert
report in order to meet the reasonable basis standard.  *See McKellar v. Sec'y of Health & Human
Servs.*, 101 Fed. Cl. 297, 303 (2011); *see also Carter v. Sec'y of Health & Human Servs.*, 132
Fed. Cl. 372, 382 (2017).  Related to that point, counsel has some obligation to investigate the
claim and what issues may represent obstacles to compensation both before and after filing;
however, reasonable basis is ultimately established by objective proof for the claim, as
emphasized by the Federal Circuit.  *Smith v. Sec'y of Health & Human Servs.*, No. 17-1169V,

2019 WL 1953358 at *2 (Fed. Cl. Spec. Mstr. March 29, 2019) (citing *Simmons*, 875 F.3d at 636).

### B. Application

In this case, respondent does not challenge the presumption of good faith. Resp. Response at 6. Therefore, I conclude that it exists.

However, respondent asserts that petitioner has failed to establish a reasonable basis for her claim because the medical records fail to support the assertion of a vaccine-related injury. Resp. Response at 6, 8. First, respondent contends that the onset of M.G.'s skin symptoms was 38 days after vaccination on February 7, 2015, when she first presented to Inova Fairfax Hospital. *Id.* at 2, 8. Respondent is correct that the hospital records describe a sudden onset of skin changes. Ex. 5 at 7. However, they also describe a history of cradle's cap. *Id.* at 7. Additionally, petitioner described that approximately one month prior (e.g., early January 2015), M.G. had developed dry skin which was initially attributed to a particular detergent but had persisted. *Id.* at 24. The family was moving from New York to Virginia around that time and was between primary care physicians. *Id.* This recollection is also supported by two photographs showing that M.G.'s right cheek appeared pink, dry, and scaly, time-stamped January 13, 2015. Ex. 3 at 1-2. These pieces of evidence make the onset of M.G.'s skin condition less clear. If the case proceeds on a litigation track, a factual determination may be necessary. Additionally, petitioner may need an expert to support that the temporal association is appropriate to ascribe vaccine causation. However, the existing record provides reasonable basis for filing the petition.

Respondent contends that an immunodeficiency was considered, but not detected. Resp. Response at 4, citing Ex. 6 at 16-18 (April 30, 2015 appointment with Dr. Loechelt at CNMC Immunology Clinic), 5-7 (June 10, 2015 follow-up with Dr. Loechelt). Respondent also contends that "there is no indication in the medical records that M.G.'s physicians considered her vaccination as playing a role in her skin conditions." *Id.* at 8. In my opinion, these arguments do not rule out reasonable basis for this claim. Numerous treating physicians including Dr. Loechelt at the CNMC Immunology Clinic recorded a history of immune-mediated conditions in M.G.'s family (particularly in her older brother). Dr. Loechelt's differential diagnosis included immune-mediated conditions including hyper-IgE syndrome and Netherton syndrome. At his last appointment with M.G. on June 10, 2015, he wanted to retest her immunoglobulins and specific antibodies to diphtheria and tetanus (both included in vaccines at issue in this claim), and see her again in 2-3 months. Ex. 6 at 5-8. Unfortunately, for whatever reason, M.G. never returned to Dr. Loechelt or any other medical providers before passing away in January 2016.[13]

---

[13] Respondent also argued that "petitioner's claim for vaccine-caused sepsis [resulting in death] is likely time-barred." Resp. Response at 8, *see also id.* at n. 5, citing § 16(a)(2). This argument seems based on an inadvertent misreading of the record. M.G. passed away on January 13, 2016 and the petition was filed on November 20, 2017, less than two years later. My reading is that the death claim was timely filed.

In short, no less than 38 days after receiving her two-month DTap, Hib, IPV vaccines, M.G. developed a severe skin condition that was difficult to diagnose and to treat. After receiving her four-month DTaP, Hib, IPV and pneumococcal vaccines and was hospitalized again for the same skin condition, raising the possibility of challenge-rechallenge. An immune-mediated etiology remained in the differential but was not adequately worked up. I find that there was reasonable basis for filing a petition alleging that the two sets of vaccines caused or significantly aggravated M.G.'s skin condition (possibly separate and unrelated to her death approximately one year later).

Respondent conducted a preliminary review and elected against informal resolution. Because petitioner did not allege a Table injury, she had the burden of establishing causation-in-fact. I reviewed the record and determined that it was sufficiently complex to necessitate expert report(s). I ordered petitioner to submit the same. Petitioner's counsel consulted with an immunologist experienced in the Vaccine Program, who declined to support vaccine causation. At that point, petitioner's counsel determined to withdraw from the claim. I find that reasonable basis existed up until that point. Counsel's subsequent billing was related to informing petitioner and the Court that she wished to withdraw. This represent's counsel's effort to "wrap up" the case, which therefore should be compensated. *See e.g., Goddard v. Sec.y of Health & Human Servs.*, No. 18-1873, 2019 WL 4165279 (Fed. Cl. Spec. Mstr. Aug. 8, 2019) (citing additional cases). Of note, from approximately May 2019 to date, counsel has remained on the case and attempted to facilitate petitioner's filing and communication with the Court. Counsel has not billed for any of that time.

### C. Interim Awards

The Vaccine Act permits interim awards of attorneys' fees and costs under appropriate circumstances, such as where the proceedings are protracted, petitioner will retain or has retained expensive experts, or petitioner would otherwise suffer undue hardship. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008); *see also Shaw v. Sec'y of Health & Human Servs.*, 609 F.3d 1372 (Fed. Cir. 2010). An attorney's withdrawal can also be an appropriate occasion for an interim award. *See, e.g., Grant*, 16-1446V, 2018 WL 5832137 at *2. Respondent acknowledges that "the decision to award interim fees is discretionary," but contends that "no special showing has been identified by petitioner or petitioner's counsel to justify an award of interim fees and costs under the particular circumstances of this case." Resp. Response at 11. Therefore, respondent recommends that I defer any award of attorneys' fees and costs.

I find that the present circumstances justify an interim award. Above, I have found that there was a reasonable basis for filing the petition.[14] Afterwards, petitioner was directed to file an expert report. Petitioner's counsel contacted an immunologist with experience in the Vaccine Program. After that consultation, petitioner and her counsel reached an impasse with respect to the objectives and course of litigation pending before the Court. Counsel filed a motion to

---

[14] Compare to Resp. Response at 11, citing *McKellar v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 297, 201 (2011) (reversing a special master's award of interim attorneys' fees and costs and remanding for a determination of whether there was reasonable basis for filing the petition).

withdraw from the case in April 2019, followed by the present motion for interim attorneys' fees and costs (incurred up to May 2019). In July 2019, petitioner herself, petitioner's counsel, and respondent's counsel participated in a status conference. Counsel agreed to remain in the case "for now" and to electronically file any additional materials that petitioner obtained. However, after the July 2019 status conference, despite repeated efforts, counsel has not been able to reach petitioner. Counsel has not requested additional fees and costs for the past few months, but wishes to be released from a case which she no longer supports. It is evident that petitioner and her counsel have now reached an impasse. Petitioner may be able to retain other counsel or proceed *pro se*. In either case, present counsel should not have to wait an indeterminate amount of time in order to receive the fees and costs incurred. Therefore, those will be awarded at this time.

## IV. Reasonable Attorneys' Fees and Costs

### A. Legal Standard

The Vaccine Act only authorizes "reasonable" attorneys' fees and costs. The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera*, 515 F.3d at 1349. Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347-58 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. *Id.* at 1348. Although not explicitly stated in the statute, the requirement that only reasonable amounts be awarded applies to costs as well as to fees. *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

Special masters have "wide discretion in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991). They may look to their experience and judgment to reduce the number of hours billed to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993). A line-by-line evaluation of the billing records is not required. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (1991), *aff'd in relevant part*, 988 F.2d 131 (Fed. Cir. 1993 (per curiam).

The petitioner "bea[rs] the burden of establishing [that] the hours expended, the rates charged, and the expenses incurred" are reasonable. *Wasson*, 24 Cl. Ct. at 484. Adequate proof of the claimed fees and costs should be presented when the motion is filed. *Id.* at 484, n. 1. Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

## B.  Hourly Rates

The interim fee decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon an individual's experience.  *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).  The Court has since updated the *McCulloch* rates.  The Attorneys Forum Hourly Rate Fee Schedules for 2015-2016, 2017, 2018, and 2019 can be accessed online.[15]  In this case, attorney Renee J. Gentry has billed $424.00 per hour for work performed in 2017; $435.00 in 2018; and $445.00 in 2019.  Int. Fee App. at 6.  Attorney Clifford J. Shoemaker has billed $440.00 per hour for work performed in 2017; $450.00 in 2018; and $460.00 in 2019.  *Id.* at 2-6.  Law students' work has been billed at a paralegal rate of $145.00 in 2017 – 2019.  *Id.* at 7-10.  These rates have previously been awarded.  *See, e.g.*, *Barker v. Sec'y of Health & Human Servs.*, No. 16-1554V, 2019 WL 4648912 (Fed. Cl. Spec. Mstr. Aug. 27, 2019); *Clubb v. Sec'y of Health & Human Servs.*, No. 15-891V (Fed. Cl. Spec. Mstr. Feb. 4, 2019).  I find no cause for adjustment in the present case.

## C.  Hours Expended

As previously noted, a line-by-line evaluation of the fee application is not required and will not be performed.  *Wasson*, 24 Cl. Ct. at 484.  Rather, I may rely on my experience to evaluate the reasonableness of hours expended.  *Id.*  Just as "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests …. [v]accine program special masters are also entitled to use their prior experience in reviewing fee applications."  *Saxton*, 3 F.3d at 1521.

### 1.  Intraoffice Communication

Special masters have previously noted the risk of inefficiency when multiple individuals work on one case.  *See, e.g.*, *Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009).  Personally, I recognize that an attorney's consultation with knowledgeable colleagues may lead to a smarter approach or efficient resolution of an issue.  However in this case, I find that there is excessive intraoffice communication that was more attributable to the operation of the law school clinic.  Specifically, Mr. Shoemaker's billing log reflects a number of intra-office communications and team meetings with students who did not bill on this case.  *See, e.g.*, Int. Fee App. at 2 ("emails from and to Jiawei re her conversation with potential client"; "review and approve Marrisa's email to client"), 3 ("email from Matt about outstanding records"; "meeting with Matt to go over status of case and next steps"; "email from Matt about his review of the records; discuss with Renee"), 4 ("review introductory email to client from Nick and approve"; "meet with team and PC w client").  I appreciate that the law school clinic provides hands-on experience and supervision by attorneys knowledgeable in ths subject area.  However, the attorneys should not bill this teaching function to the Vaccine Program.  **Accordingly, I will deduct 5% from the attorneys' fees, resulting in a deduction of $978.05.**

---

[15] United States Court of Federal Claims – OSM Attorneys' Forum Hourly Rate Fee Schedules, available at http://www.cofc.uscourts.gov/node/2914 (last accessed on October 29, 2019).

### 2. Duplicative Work

Attorneys' fees should not include work that is "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. at 434. Here, the structure of the law school clinic resulted in duplicative work. Only one law student was assigned to work on the case at a time. That work included obtaining medical records and communicating with the petitioner herself. But when the assigned law student left the clinic, he or she "closed out" the case. Then the case would be assigned to a new student who reviewed the previous work, conferred with the supervising attorneys, and introduced himself or herself to the petitioner. In my experience, in a typical firm structure, a case is not handed off from one paralegal to a second paralegal to a third paralegal in less than two years. This only occurred in the present case because the law students completed their time in the clinic and/or graduated. This created duplicative work. **For this reason, I will deduct another 5% from the attorneys' fees, resulting in a deduction of $978.05.**

### D. Costs

Like attorneys' fees, costs incurred - by counsel or petitioners themselves - must be reasonable to be reimbursed by the Program. *Perreira*, 27 Fed. Cl. 29, 34. Here, petitioner's counsel submitted the $400.00 filing fee, which is certainly reasonable. Counsel also submitted Dr. Joseph A. Bellanti's invoice for 9.0 hours reviewing this case and providing an informal opinion regarding possible vaccine causation. Dr. Bellanti's requested rate is $400.00 per hour. Thus, his total invoice is for $3,600.00. Int. Fee App. at 11. I find that this is consistent with past cases and adequately documented. Counsel consulted with the expert pursuant to my order. **Accordingly, counsel's interim costs totaling $4,000.00 are awarded without adjustment.**

## V. Conclusion

In accordance with the foregoing, petitioner's motion for *interim* attorneys' fees and costs is **GRANTED**. I award the following reasonable interim attorneys' fees and costs at this time:

| | |
|---|---|
| Interim Attorneys' Fees Requested: | $ 19,561.00 |
| Reduction (Intra-Office Communications) | $    (978.05) |
| Reduction (Duplicative Student Work) | $    (978.05) |
| **Interim Attorneys' Fees Awarded:** | **$ 17,604.90** |
| **Interim Attorneys' Costs Awarded:** | **$   4,000.00** |
| **Interim Attorneys' Fees and Costs Awarded:** | **$ 21,604.90** |

Accordingly, I award the following:

1) **A lump sum in the amount of $21,604.90, representing reimbursement for *interim* attorneys' fees and costs, in the form of a check payable jointly to petitioner and the George Washington University Law School Vaccine Injury Clinic.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment forthwith.[16]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[16] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review.  Vaccine Rule 11(a).